May it please the Court, Dana Duncan on behalf of Joshua Lanigan, the plaintiff appellate in this case. On January 15, 2013, Mr. Lanigan complained of intermittent episodes of visual hallucinations in which he sees animals or individuals in his periphery. About one year earlier, he began isolating himself. He reported panic attacks in February of 2012. In March, he had suicidal preoccupation. By April of 2012, he was unable to go into stores. By March of 2012, he was found with major depression, with anxiety disorder and possible bipolar disorder. By June of 2013, records report Mr. Lanigan had had four suicide attempts in the past six months. He had a lack of energy. He was hopeless. He isolated himself. He had difficulty out in public. Yet somehow this fact pattern is supposedly encapsulated in the hypothetical question presented by the ALJ and incorporated into the residual functional capacity. So tell me exactly what you think the hypothetical question should have said. Well, the hypothetical question should have taken into account the fact that, for example, well, in this particular case, the ALJ had asked the vocational expert about occasional contact with the public. He then, the vocational expert testified at hearing that occasional would preclude competitive employment. The judge then used frequent in the residual functional capacity without any explanation as to why frequent applied and not occasional. Basically, Judge, these questions So where does the, I'm looking at 810, this is page 6 of 10 of the ALJ's opinion, where she says, I find the claimant has the residual functional capacity to perform light work except for the following restrictions, something about stooping, crouching, kneeling and crawling, limited to simple routine repetitive tests, only occasional interaction with the public. Is there some other place I should be looking to? No. My error in that. I don't understand what, okay. My error, I apologize. I mean, there's certainly But the vocational expert's testimony did indicate occasional interaction with co-workers would generally preclude competitive employment. Right. I mean, that much I know. The ALJ returns several times, I'm sorry, it's a man, ALJ Jacobson. Yes. He returns several times to the fact that Mr. Lannigan has been doing this part-time work. Correct. I guess at Home Depot, right? Michael's. Oh, right, I'm sorry, Michael's, the craft store. And the advantage, Your Honor, that I have in this is that once the case is in federal court, you can file a second administrative appeal. So I was able to develop the second application. And I can indicate that I have information pertaining to that job that was not in the record. Basically, he was unloading trucks by himself. He lost that job not long after the hearing in this case. Got another job working for the Wausau Daily Herald, the local newspaper, delivering or unloading trucks with newspapers and papers and stacking bundles for delivery. Lost that job. But going back to the record, I understand that in the record he testifies that he has these five-hour shifts, three or four days a week, but he takes three to five breaks during each shift, sometimes for up to 20 minutes. So essentially, if it's just three shifts, if it's just three breaks, 20 minutes, then he's really just working four hours out of the five. Correct. He'd be off task more than 10 percent.  Correct. Moreover, unscheduled breaks of that duration by the fact that, you know, on the average I try between 30 and 50 hearings a month, that kind of restriction would be more preclusive. So the ALJ here says if the break is one where the person stays at the workstation, whatever that may be, that's one thing. But doesn't the ALJ also say if you have to wander off and go some other place, that's preclusive? Yes. It does. He does. The problem is, judges, and I've cited this in both the brief and the reply brief, the hypothetical question that was presented is almost like a Rorschach test. The judge is using these cases on a regular basis, knowing perfectly well that the result will be plenty of jobs. You can look at the case log. I mean, we just don't see them. I don't want to go quite that far. But I thought another point you made in your brief was a question about where this off task up to 10 percent number came, since the ALJ says if it's more than 10 percent, which I guess if it's 11 percent or something, then there's no work. Correct. The 10 percent is a standard number that vocational experts regularly say is acceptable in the workplace, that people can be off task up to 10 percent without it being disruptive or employers complaining. It has nothing necessarily to do with mental illness. I've asked that question repeatedly of every vocational expert. It can be 10 percent if they're playing fantasy football. As long as they're doing 10 percent off task, employers generally don't care. When it exceeds that, that's when they start to care. And in this particular case, to argue or to point out that that 10 percent somehow reflects the claimants or Mr. Lanigan's mental illness is disingenuous because it's a number that has no real meaning. It's just something that's pulled out. It's a preconceived notion, preconceived idea that this is acceptable. Maybe so, but I guess I would have thought if you're arguing that the hypothetical itself needs to have some grounding in the medical facts about how often this man would be off task, then I can see your point, given his testimony about how often he's off task even in his part-time job. I mean, I don't want to go into the business of, you know, sort of common experiences that employers can tolerate six minutes of fantasy football out of every hour. That surprises me a little bit, but, you know, if that's what they can do, I'm not going to question that. But I do understand that the hypothetical has to reflect what this individual can do. Correct. And in this particular case, Mr. Lanigan suffers from generalized anxiety disorder and major depressive disorder. If you look at the criteria under the DSM-5 Diagnostic Systems Manual from the American Psychiatric Association, anxiety disorder, restlessness, feeling keyed up, being fatigued, difficulty concentrating or mind going blank, irritability, muscle tension, sleep disturbance. Some of these may very well show up in this hypothetical question, but we don't know what basis the judge had in this. There's never an explanation. We get these hypothetical questions and we're left to try to figure it out. And quite frankly, the law has for a long time been an administrative proceedings that you're supposed to limit your investigation to the actual writings or interpretations in the ALJ's decision. And if the ALJ is not explaining where these are coming from or what evidence supports it, as a reviewing court, how can you uphold it? Well, the ALJ does talk about his mental impairments in the section of the opinion in which he's looking to see if one of the listed impairments is met. He doesn't spend too much time other than that. No, and the problem again is just stating what his impairments are and some of the specifics does not create the nexus that's necessary to necessarily understand where these came from. Why is it that no piecework or fast-moving assembly-type work is precluded but nothing else is? Quite frankly, as I noted, if you're having visual hallucinations, you're probably likely to be disrupted and not focused on your work, whether it's fast-paced or assembly-line work. Okay, well, if you want to save just a sec for rebuttal, I will suggest you do so. All right, Mr. Truitt. May it please the Court, I'm Eric Truitt on behalf of the Commissioner. This case was approached in the district court level as if the medical opinions of the state agency consultants were substantiated, and he essentially was arguing that the ALJ had not fully incorporated or represented those opinions, but the argument was not that there was additional medical evidence that the ALJ failed to consider or there was some other medical opinion that indicated greater limitations than what the ALJ reflected in the RFC finding and the hypothetical questions still to this day. But our review is for substantial evidence, and we review the ALJ's opinion. We don't review the district court's opinion, filtering the ALJ's opinion. No, I understand that, but in terms of it was essentially conceded, there wasn't an argument or evidence pointed to that Mr. Lanigan was more restricted than what the ALJ found. Like, if you look at the opinions of the state agency medical consultants, he didn't say that the ALJ erred or shouldn't have given great weight to those opinions. The argument was instead, and he didn't point to another medical opinion that the ALJ should have credited. Instead, it was essentially an argument that the ALJ had not encapsulated the opinions of the state agency consultants into the RFC finding. Right, and I think he's continued with that argument. He's making it, you know, with more flesh on the bone, so to speak, which is very typical. But I will point out that I'm concerned, actually, about this 10% off task, given the evidence in the record. I'm concerned about the ALJ's equation of the part-time work at the Michaels, which he testifies is done with the manager knowing that he's got these psychological problems, making allowances for him with this, you know, random 20-minute-at-a-time breaks, you know, going off to the restroom and calming down or whatever he's doing. I mean, that's not the same thing as a regular full-time job. There's plenty of law that says that. So I'm concerned that the ALJ is relying on things that we've said are not reliable. Well, it's true that the ability to do part-time work is not proof that someone's not disabled. And in particular, part-time work, which is being done with allowances for the disability. Well, that's assuming that the ALJ was obligated to fully credit how he characterized his own work. But I think the ALJ did credit that. The ALJ asked him at the hearing if he had ever missed any days of work due to his symptoms. But what the ALJ says, he says the claimant's testimony at the hearing was generally credible. And so I don't see that as questioning this. Generally credible does not mean that the ALJ... It does indicate the daily activities have been sometimes greater. But he actually works in a retail store about 15 to 22 hours a week in five-hour shifts. But what the ALJ fails to comment on, one way or the other, actually, is the very substantial breaks that he's taking. I don't know if this ALJ believed it, didn't believe it. But it's evidence that would suggest to me that you shift over to the vocational expert's negative opinions as opposed to the positive ones. Well, a couple things about that, Judge Wood. First is the ALJ did ask him at the hearing about if he had ever missed any days of work due to his alleged symptoms. The idea being if you were having so much trouble working, you probably would have missed at least one day during this period. The ALJ also commented several times in the decision that despite his complaints, he was still able to go to work and maintain employment. Right. And that's what worries me because this opinion really hinges on that particular finding. But it's as though one could read this to think that the ALJ thinks that he is successfully working a real 15 to 22-hour-a-week job in five-hour shifts while at the same time we have the vocational expert saying that if you're taking breaks more than 10% of the time, you're unemployable, and he's taking breaks more than 10% of the time. But in the ALJ finding that he was able to maintain this employment, does that not suggest that he was not, in fact, taking these breaks? No, it doesn't. It suggests that because he testifies that the employer for this kind of part-time work is accommodating him. Well, what do you think the odds are that a seasonal employer who's hiring him because they're extremely busy, who doesn't have any previous relationship with him, is doing something that the vocational expert said? Some people are decent. Maybe they have a very nice management. But substantial evidence doesn't have to be a preponderance. It need only be reasonable. A reasonable person could think it unlikely that this company that needs extra work during a busy seasonal period is not going to be employing someone who's only working, you know, 80% of the day. But there's no, you're just totally speculating about that. Well, I'm not speculating. I don't see any anchor in the record. Well, the anchor in the record is twofold. The ALJ asked him about his symptoms and if he missed work at the hearing, and then the ALJ several times said, despite his complaints, he still was able to maintain this employment. So it's not as if the ALJ had never mentioned his employment as a factor, I would agree that it would be improper to speculate that as a basis for the decision. But here the ALJ is clearly relying not only on the opinions of the state agency psychological consultants, but also the fact that he was able to hold on to this job at least, you know, as long as the ALJ knew. Did the ALJ know he'd only had it for six weeks? Yeah, I mean, the ALJ was aware that these were seasonal because he had had prior seasonal employment as well. So the ALJ is extrapolating from a six-week part-time job. Well, again, that's not, the main basis for the ALJ's decision is the, at least there's no other medical opinion that contradicted the opinions of both of the state agency psychological consultants. But there's a lot of opinion that he's got suicidal ideation, that he's Well, those aren't medical opinions by his doctors about what he can and cannot do. They often tend to be, I mean, sometimes those are just him reporting various symptoms to his doctors, how he's feeling at a particular day or a particular time. But as the ALJ pointed out, to be disabled, you have to have those types of symptoms for the duration period, 12 continuous months. So the fact that he had certain periods or days during the course of the record in which his symptoms were very difficult to manage, does not mean he was disabled from, I believe it was 2009 when he alleged he was disabled, all the way through the ALJ's decision. And you can pay attention for a few minutes, depending on what it is. I mean, is that, are you referring to his report or is that a doctor's conclusion? That's what he says, the ALJ's recounting. It's what the ALJ says, that he can do this. But for example, if you look at treatment notes, for example, starting on page 1433 of the administrative record, you'll see a section called assessment that's in essence, it's called a mental status examination, something a clinician does. He's consistently rated as having a good attention span and otherwise ability to communicate and relate with his clinicians. So it is true, at times he's reporting to the agency, as most disability claimants do, what his symptoms are. But those aren't backed up by his, his clinicians aren't fully endorsing those symptoms. None of his doctors came forward and said, you know, the state agency psychological consultants here are underestimating his mental limitations. So this is a case where this court is commonly telling the ALJs, you know, place more weight on medical opinions, do less freelancing on your own. This is a case where you have two medical opinions that support the ALJ's decision, and you have no medical opinion from a treating or examining source that suggests that he's more limited than the ALJ found. Don't those medical opinions predate his involuntary mental health commitment? They do. And in those cases, what the ALJ does is the ALJ looks at the subsequent evidence and determines whether it warrants an opinion. And if you look at those same treatment notes that I previously referenced, beginning on page 1433 of the administrative record, this was, in essence, a short-term crisis, as opposed to something that would have prevented him from working for a 12-month period. That's not what Carrie Pizer says. And doesn't Dr. Pizer, I think it's a psychologist, not a psychiatrist, but isn't that a rather continuous treatment relationship post-involuntary commitment? He is in treatment, but, for example, if you look at starting, I believe the incident was in June 2013. If you look at the treatment notes beginning in July 2013, right after the incident, he was rated as having a moderately anxious mood. From there on, beginning on July 9th forward, he's indicated as having mild depression and no repeat of those symptoms that led to what he characterized as a dissociative event. So he repeats the blackouts. He testifies that these blackouts occur. I mean, he states that, but there's also medical records that say that he wasn't diagnosed with a dissociative disorder. Again, this is a case where none of his doctors are saying what he can or can't do or that he's unable to work, whereas you have two doctors along with subsequent treatment notes suggesting that he did have an incident that, of course, if that was representative of his mental state during the entire four-year or five-year period, of course that would be very problematic. On the other hand, if you look at the evidence before and after, that's sort of the worst of his symptoms as opposed to continuous problems. Well, the other complication here is that the hypothetical that was given to the vocational expert assumed that he could undertake frequent contact with coworkers and the public, and the record evidence in the ALJ's decision itself says that he can only work occasionally with other people, and the vocational expert apparently gave an opinion that if he can only sustain occasional contact with coworkers and or the public, then he cannot be competitively employed. Actually, Judge Seitz, if you look at pages 64 and 65 of the administrative record, he was able to work if he could tolerate occasional. The thing that would be work-preclusive is if he could tolerate absolutely no contact in the workplace because the VE said even in the most manual of labor jobs, you're going to at least be somewhere near another person. Right. No, I know that the record supports occasional contact, but didn't the hypothetical assume frequent contact? Again, on page 64 through 65, he asked about occasional, and that's what matches the RFC finding for occasional. So you're telling me that the vocational expert's hypothetical did not assume frequent contact? There is a response to a question, again, on those pages that I cited for occasional. But frequent is what Judge Seitz is asking you about. I believe there was a question. What they typically do is they'll ask a less restrictive hypothetical, and then they'll change that. So, again, on 64, there's a question about occasional, and there's a response that that would reduce some of the- We'll have to look at the record because there's a-page 65 seems to say if it's even occasional with coworkers, that there's preclusion from competitive employment, not absolute isolation. Well, that question is, okay, what if rather than occasional, the individual were limited to no contact? No, what about occasional? Occasional is that response on the top of page 65, which identifies numbers. All right. Well, I think your time is up, so we thank you. And, Mr. Duncan, if you need an extra minute, I'll give it to you. All right. I'll keep it short. I have little option otherwise. True. You have to keep it short. By standard and by height. The idea that the ALJ could be dismissive at all or the commissioner because there's no mental impairment or no mental report is a little bit suspect. The commissioner is the only one-I mean, if we're putting that much stock on mental impairments, then a mental impairment report or a psychiatric report should have more influence on the determination of a case. Yet, if we come in and say, well, he ignored this report, the commissioner's first response always is, well, the ultimate issue of disability is left to the commissioner. So, therefore, we don't have to give this that kind of weight. So, you can't have it both ways. You can't be critical that there's an absence of a report, and then when the report says that he's disabled going, well, you can't say that either. In this particular case, too, Mr. Truitt or the commissioner's argument was that the ALJ gave significant weight to this or to the state agency psychologists. The problem is his decision indicates he gave great weight to the opinions of the psychologists or of the physical doctors. He doesn't really say anything per se about the mental impairments. He says, I place great weight on the opinions of state agency medical consultants that the claimant can sustain light to medium work. Well, furthermore, if indeed that's the case, and as I pointed out in my brief, the hypothetical, I mean, the narrative report of the state agency doctors indicated he was limited to unskilled, simple type work, which by multiple cases has been determined to not reflect concentration, persistence, and pace. You have to then go to the check boxes, and they mark that he had problems with punctuality. He had problems with attention and concentration. He had problems working around other people. And none of those specific things, punctuality or any of those, are specifically addressed in the hypothetical question. Okay. Thank you very much. Thanks to both counsel. We'll take this case under advisement.